UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CR22-198-RSL |
| Plaintiff, | DEFENSE MOTION TO REVOKE DETENTION ORDER |
| v. | **<u>Oral Argument Requested</u>** |
| GIANNI S. THOMAS, | Noted for January 6, 2023 |
| Defendant. | |

Gianni Thomas, through Assistant Federal Public Defender, moves for an order revoking the detention order entered against him on November 1, 2022, Dkt. 14, and maintained following a hearing held on December 13, 2022. Dkt. 28.

## I.      RELEASE PLAN

The defense asks the Court to release Mr. Thomas (1) directly to inpatient treatment focused on both his substance use disorder and mental health, then to a sober living house; (2) directing continued participation in Community Passageways, a community-based violence reduction program; (3) with location monitoring (home detention); (4) to return to a job with a supportive employer who attended his initial detention hearing and spoke on his behalf, and (5) with all of the standard and special conditions typically imposed in a case like this (e.g., travel restrictions, ongoing mental health and drug treatment, no new law violations, submitting to search).

//

//

DEFENSE MOTION TO REVOKE
DETENTION ORDER
(*U.S. v. Thomas*, CR22-198-RSL) - 1

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

## A. Treatment and Residence Specifics

Mr. Thomas has been accepted into Pioneer Human Services' Co-Occurring Residential Program (CORP) at North Sound Behavioral Health Treatment Center. The program is 60–90 days long and offers the following:

> A comprehensive range of services [] geared to treat the needs of [people diagnosed with a substance use disorder and mental health issues] over a longer period of time. An interdisciplinary team of licensed medical personnel, mental health and substance use disorder professionals, and case managers coordinate service delivery. Specialty services are provided with a comprehensive assessment of a client's needs…. Mental health treatment includes medication management instruction.

https://pioneerhumanservices.org/treatment/centers.

Following completion of inpatient treatment, Mr. Thomas would move to a sober-living house, rather than back with family, so that he would continue to live in a structured setting that involves urinalysis testing and a "house manager" who could report positive urinalysis tests or other issues to Pretrial Services.[1]

## B. Community Passageways

Early on, counsel raised with Mr. Thomas the idea of connecting him with a community-based violence prevention program focused on mentoring young people entangled with the criminal legal system. He embraced the idea immediately. Like so many young people the Court sees, Mr. Thomas's life pushed him to grow up fast and put him in supportive, adult-like positions relative to people who should have been the ones offering support. It became clear early on that Mr. Thomas's experiences left him

---

[1] Counsel estimates that space in a sober living facility could be secured with roughly a 2–3-week turnaround once Mr. Thomas enters inpatient treatment so that it would be ready when he graduates. Although counsel believes it unlikely to happen, if there was a brief gap between inpatient treatment completion and clean and sober housing space, Mr. Thomas could reside at the Residential Reentry Center and would have no objection to his bond being modified off-calendar to add that condition.

DEFENSE MOTION TO REVOKE
DETENTION ORDER
(*U.S. v. Thomas*, CR22-198-RSL) - 2

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

hungry for the type of guidance, support, consistency, and guidance many take for granted. Community Passageways's model is designed to fill this kind of role:

## Who We Are

Community Passageways (CP) is a Seattle based nonprofit founded in 2017 with a vision for zero youth incarceration. As a felony diversion and prevention program, CP is leading the way in reimagining and actively creating an alternative to today's criminal legal system.

Over the last 20 years in Seattle, we have seen a sharp decline in the number of young people in detention. But even as the overall number decreased, our current juvenile legal system has a disproportionately harmful impact on youth of color, particularly black youth. While only 10% of King County's 2 million residents are black, they now make up almost half of the detention population on any given day, and more than half of felony offenses.

We have a four-pronged approach to community justice:

- Prevention: Keep youth on a good path. Show them new paths.
- Diversion: Keep people out of the prison system and in community.
- Support: Support people already in the prison system.
- Reintegrate: Ensure a smooth, successful integration into the community.

Our community-centered and evidence-based model provides an alternative to the current criminal legal system. We collaborate with families, schools, the court system, correctional center staff, religious institutions, policy makers, and community members to support adolescent youth of color. We provide youth mentors and access to programs focused on personal healing, identity development, and leadership building.

We employ men and women from the community who share similar racial, cultural, and socio-economic backgrounds with our young people who have lived experience navigating the full spectrum of the school-to-prison pipeline to act as credible messengers and Ambassadors. Our Ambassadors work with heart, humility, and compassion, to lead community and school-based healing circles, individual and family case management, court advocacy, and youth leadership opportunities.

Young people kept in the community through their dedication and our support have gone on to enroll in college, start businesses, graduate from high school, and help rebuild our communities.

https://www.communitypassageways.org/ ("About" page).

DEFENSE MOTION TO REVOKE
DETENTION ORDER
(*U.S. v. Thomas*, CR22-198-RSL) - 3

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

Mr. Thomas was accepted to Community Passageways while at the Federal Detention Center (FDC) and has been working with a mentor named Zaheed Lynch.[2] As it happens, counsel met Mr. Lynch prior to Mr. Thomas's Community Passageways acceptance when Mr. Lynch accompanied young people to multiple panel discussions hosted at Kent high schools during an annual "Civics Day"[3] program. Counsel thus had the privilege of seeing Mr. Lynch interact with young people—both his mentees and the high school student participants—and learned more about his background.


Zaheed Lynch mentors youth struggling with fentanyl use.

Mr. Lynch began working at Community Passageways as a volunteer while he studied at the University of Washington. His dedication, empathy, and insight were manifest. Counsel was thrilled to learn that he had been assigned to work with Mr. Thomas. The two quickly developed rapport when Mr. Lynch first visited Mr. Thomas at the FDC. They have met multiple times since then. Given this, if released, Mr. Thomas will have the additional benefit, during inpatient treatment and

---

[2] Cabotaje, Angela, *True Stories: What We Lost and Found After Fentanyl*, SeattleMet (November 3, 2022) (https://www.seattlemet.com/health-and-wellness/2022/11/fentanyl-addiction-recovery-true-stories-seattle-king-county#zaheed-lynch)

[3] Civics Day introduces high school seniors to the criminal legal system and includes a panel comprised of Community Passageways participants and mentors. The FPD has partnered in the full-day program since 2018, which has been co-sponsored by the ACLU of Washington since 2020. Undersigned counsel serves as the program-day lead and works on the curriculum with Kent School District and ACLU-WA partners. *See* https://waw.fd.org/node/2731 (FPD Website "News" page, January 2020).

DEFENSE MOTION TO REVOKE
DETENTION ORDER
(*U.S. v. Thomas*, CR22-198-RSL) - 4

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

after, of having a mentor he trusts who understands the challenges he faces and can help him navigate them.

### C. Employment

Owing to Mr. Thomas's geniality, work ethic, and his employer's ability to see that he is more than the worst thing he has ever done,[4] Mr. Thomas has a job to return to after he completes treatment. Prior to his arrest, Mr. Thomas was working at a retail TMobile store. His employer attended Mr. Thomas's first detention hearing and spoke on his behalf. He wanted to attend the second hearing but was unable to leave work due to a corporate requirement that day. At the initial detention hearing, Mr. Thomas's employer introduced himself and then described:

> I know that he's had some situations that he's been working with the courts, and we've been going through and trying to work with him.
>
> One thing that I can say is that in the amount of time I've had with him, he has been super reliable, very friendly, very "get the job." One of the things I can say is, is that one of the things that I personally look for is somebody that's nervous for wanting a position when they're looking for a job. Even with the prep, I think that he was nervous and wanted to call and wanted to have a good interview because the first interview went with – went through with me, and the second one was with the district manager.
>
> We were aware of the situations in the past and, ultimately, we wanted to be able to work with him and see how he did. What I can say is that as of right now, he's been nothing but an exemplary employee, and I can't speak to anything in his pat. All I can speak is to what I see him in every day. And what I can say is that he is a part of the team. He comes in, he's friendly, he works with the customers, hasn't had any kind of problems with anybody in any way, shape or form.
>
> So one thing, I guess that's what I want to say the most, is that as far as what I can personally see, is that he has been nothing but excited and interested in moving forward, despite whatever he has in this past that hopefully will be resolved at some point.

---

[4] "Each of us is more than the worst thing we have ever done." – Bryan Stevenson.

DEFENSE MOTION TO REVOKE
DETENTION ORDER
(*U.S. v. Thomas*, CR22-198-RSL) - 5

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

Exhibit 2 (transcript) at 21–22; *see also* Exhibit 5 (work photos). The Court knows how rare it is for an employer to write a letter supporting release—much less one who attends a detention hearing to speak on someone's behalf. That the store manager did so speaks to Mr. Thomas's potential, warmth, and ability to follow through on directives. Knowing that his employer has stood by him and advocated for him during this process only strengthens Mr. Thomas's commitment to demonstrate that his employer was right to take a chance on him—and he doesn't take that opportunity for granted.

## II.    PROCEDURAL HISTORY AND ADDITIONAL BACKGROUND

### A.    Arrest, Pretrial Services Investigation, and First Detention Hearing

On October 25, 2022, Gianni Thomas appeared before Magistrate Judge Brian A. Tsuchida for his initial appearance after having been arrested on a Complaint charging him with two counts of Unlawful Possession of a Firearm, in violation of 18 U.S.C. § 922(g)(1). Mr. Thomas was detained pending a detention hearing scheduled for November 1, 2022. Dkt. 6.

Mr. Thomas was interviewed by United States Pretrial Services ("Pretrial") on November 1, 2022, in the United States Marshals Service lockup at the courthouse. During that interview, Mr. Thomas disclosed to Pretrial that his father was killed by law enforcement in 2007.[5] Given the newness of the attorney-client relationship, defense counsel was not at that point privy to more detailed information about Mr. Thomas's trauma history. His grandmother verified that her son was murdered by police, as well as that Mr. Thomas attended counseling after his father's murder. He disclosed, and his grandmother confirmed, that he has not received any additional mental health treatment

---

[5] A civil settlement was ultimately reached regarding Mr. Thomas's father's murder by police. Cash seized when Mr. Thomas was arrested, which has since been civilly forfeited by law enforcement, was actually from an initial payment to Mr. Thomas from that civil settlement.

DEFENSE MOTION TO REVOKE
DETENTION ORDER
(*U.S. v. Thomas*, CR22-198-RSL) - 6

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

since his father's murder. Pretrial also spoke with Mr. Thomas's employer, who verified that his job remained waiting for him if he was released.

At his initial detention hearing, Mr. Thomas proposed the following release plan:

> **II.  PROPOSED RELEASE PLAN**
>
> The defense asks the Court to release Mr. Thomas to Pretrial Services supervision upon an appearance bond including the standard conditions of supervision, residence and search conditions, travel restriction to the Western District of Washington, and the following additional special conditions:
>
> - Active GPS location monitoring with curfew.
> - Chemical dependency evaluation and treatment as directed; UA testing.
> - Mental health evaluation and treatment as directed.
> - Maintain employment.
>
> Mr. Thomas would also be under DOC supervision.
>
> Through DOC, he is engaged with STOPWA—an agency that provides anger management and domestic violence prevention services.[1] STOPWA confirmed to the Federal Public Defender that Mr. Thomas underwent a domestic violence assessment with their program on October 11, 2022, which is still being completed.

Dkt. 11 at 2. The FPD had also arranged for Mr. Thomas to be interviewed for a substance use disorder evaluation while in the USMS lockup prior to his detention hearing. *Id.* at 2–3. The evaluation was not available until after the hearing, however. The defense was also in the process of referring Mr. Thomas for participation in a community-based violence prevention program. *Id.* at 3. At the time, the FPD was pursuing referral to either the YMCA's Alive and Free Program[6] or Community Passageways. *Id.*

After reviewing the Pretrial Services Report, including Pretrial's concern about the proposed release address, and hearing arguments from counsel, the Magistrate Judge ordered Mr. Thomas detained. Dkt. 14; Exhibit 2.

---

[6] Alive and Free program description available at: https://www.seattleymca.org/social-impact-center/youth-young-adults/violence-prevention-intervention.

DEFENSE MOTION TO REVOKE
DETENTION ORDER
(*U.S. v. Thomas*, CR22-198-RSL) - 7

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

**B.      Work with the FPD, Treatment Admission, and Second Release Plan**

After Mr. Thomas was ordered detained, the FPD continued to get to know him and to find an appropriate treatment placement. As he grew to trust counsel more, Mr. Thomas disclosed that he saw his cousin die by a gunshot to the head. The details of his cousin's death haunt him, and he described experiencing hallmark symptoms of post-traumatic stress—difficulty sleeping, persistently feeling unsafe, and flashbacks. He also discussed further growing up without his father and how triggering George Floyd's murder was for him given the echoes of his father's death. It became clear that the nightly drinking and marijuana use Mr. Thomas described to Pretrial and the substance use disorder evaluator has been self-medication for trauma.

Unlike many people, Mr. Thomas is eager to talk about his struggles and to engage with mental health treatment. He did not need to be convinced that he needs mental health treatment. He carries positive impressions of mental health treatment from the brief period he spent in counseling after his father was killed. He is also open to taking medication for his mental health. He recognizes that his pain, his substance use, and the times he has acted out in the past are interconnected. He also recognizes that he cannot work through them alone.

Mr. Thomas has demonstrated that he will accept outstretched helping hands. He made the most of the change TMobile gave him; he has embraced Mr. Lynch's mentorship; and he has increasingly come to reach out to the FPD for support on days he struggles emotionally at the FDC. Counsel has no doubt that he would do the same with Pretrial Services—particularly understanding that the Court would be monitoring whether he continued to earn the opportunity given to him.

DEFENSE MOTION TO REVOKE
DETENTION ORDER
(*U.S. v. Thomas*, CR22-198-RSL) - 8

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

### C. Supplemental Pretrial Services Investigation and Second Detention Hearing[7]

On December 8, 2022, the defense filed a motion to reopen Mr. Thomas's detention hearing. Dkt. 22. While it did not agree to release, the government did not oppose reopening the detention hearing based upon new information the defense presented. *Id.* Counsel forwarded the proposed release plan (the same plan outlined above) to the government and Pretrial Services before the hearing. In response, Pretrial requested the substance use disorder evaluation Mr. Thomas completed, which counsel provided.

That evaluation was dated November 4, 2022—10 days after counsel was appointed to represent Mr. Thomas. *See* Dkt. 5. Based upon Mr. Thomas's disclosure of past substance abuse and counsel's expectation that he would need to do drug treatment if released, the FPD sought to get a jump on the placement process by having a drug assessment done while he was in custody. Counsel was at the time focused on drug treatment because of funding challenges to placement that necessitate a certain type of assessment for clients with Medicaid. The FPD did not ask for a mental health evaluation and did not at the time know very much about Mr. Thomas's trauma history given the newness of the attorney-client relationship.

During the evaluation, Mr. Thomas disclosed that he was diagnosed with PTSD and ADHD in 2021 and also endorsed having had "a significant period (that was not a direct result of drug/alcohol use) in which [he] experienced": "grief/loss issues," "depression," and "sleep disturbances." The evaluation notes that "THOUGH NOT ON MED'S [*sic*.] HAS GOOD...PRESENTS TO NOT NEED SERVICES." The

---

[7] While heavily quoted, the second detention hearing summary here is not exhaustive. Counsel highlights issues of concern and contention in this brief and relies upon the attached transcript for the complete record.

DEFENSE MOTION TO REVOKE
DETENTION ORDER
(*U.S. v. Thomas*, CR22-198-RSL) - 9

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

evaluation thus documented Mr. Thomas's mental health diagnoses, distressing symptoms, and prior use of mental health medication.

At the second detention hearing, Pretrial Services recommended detention. A component of its recommendation was that it did not perceive a sufficient nexus between Mr. Thomas's substance abuse and offense conduct (currently alleged or prior) and noted a passage in the evaluation that indicated there was no need for mental health treatment at the time of the evaluation. It further faulted the description of Mr. Thomas's support network in the evaluation as one of only "passive support" in the community. Counsel acknowledges forgetting the "presents to not need services" comment when Pretrial Services requested a copy of the evaluation. Had counsel remembered, or had Pretrial Services reached out to counsel for more detail about the treatment placement upon reading the evaluation, counsel would have reiterated the trauma history already known to Pretrial Services and additional information learned since then. Irrespective of any additional trauma history information, it bears emphasis that Pretrial Services knew that: (1) Mr. Thomas lost his father to police violence that he described as continuing to impact him; (2) he was diagnosed by King County with PTSD in 2021; (3) he had previously taken mental health medication; (4) he and the FPD believed he needed mental health treatment; and (5) North Sound Behavioral Health viewed him as an appropriate candidate for their CORP program that provides both substance use disorder and mental health treatment.

At the detention hearing, counsel outlined the proposed release plan and then expressed concern about Pretrial Services's characterization in its supplemental report, stating:

> And I think that the treatment program we are recommending to the Court is absolutely an appropriate treatment. I, as I said, was a little troubled to see in the Pretrial Services report a sort of parsing – and as I read it, at least – was suggestion that perhaps the mental health component wasn't

DEFENSE MOTION TO REVOKE
DETENTION ORDER
(*U.S. v. Thomas*, CR22-198-RSL) - 10

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

something that was supported by the evaluation, or that my perception was that we were somehow shoehorning him into a specific program.

As the Court knows and Pretrial Services knows from our earlier interviews, Mr. Thomas is someone who has experienced profound trauma in his life. His father was killed by police in a very violent fashion. He has experienced personal trauma himself. And I think that the idea that there is no connectedness to his trauma experiences, to his prior cases, to his numbing through alcohol and drugs is not something that I think the record supports.

What the Court has before it is a young person who has a huge amount of potential, is just an absolute joy to work with, has had a lot that he has been trying to navigate on his own, that he was put in a position to essentially kind of the head of the household at a time when wat he really needed was support and help. He has shown that he is amenable to treatment. As indicated during the last hearing, his grandmother did send all of the children to mental health counseling after his father was killed, but that was not something that was maintained.

George Floyd's murder was incredibly triggering for him, given the similarities between that and the way that his father died and – I would just leave it that it concerns me that the need for both mental health treatment and drug treatment and the connection to offenses in the past, to challenges that he's had, is not being recognized.

Exhibit 1 (transcript) at 9–11. Counsel further noted that the FPD was able to confirm that Mr. Thomas enrolled in the STOP program as required from another case. *Id.* at 12. In addition to counsel and FPD paralegal Cindy Steward, Zaheed Lynch and two community supports (friends and coworkers) were also in court to support Mr. Thomas. As already noted, Mr. Thomas's boss wanted to attend but could not due to a work obligation. He reiterated his ongoing support for Mr. Thomas, however, and asked counsel to relay it to the Court.

The government then argued for continued detention, stating:

First off, I'd like to just say that I do commend Ms. Pai-Thompson's zealous advocacy for Mr. Thomas, and I appreciate that he's very youthful. But, unfortunately, my job is to look at his history and the

DEFENSE MOTION TO REVOKE
DETENTION ORDER
(*U.S. v. Thomas*, CR22-198-RSL) - 11

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

conduct that he is charged with committing and his risk to the community. And because of those things, I cannot join defense counsel's requests.

I do think that, in addition to very concerning crimes that are charged, have been committed while on supervision with the Department of Corrections, the other sort of large pause for me is that I see a lot of no contact order violations and protection order violations. And those, from a prosecutorial perspective, are always markers of either an inability or an unwillingness to follow court conditions. And there would be so many that would need to be cobbled together to make this a cohesive, doable plan.

I just think that the combination of the history, being on supervision and these violations, repeated violations of no contact orders, presents a situation where we are requesting the Court maintain Mr. Thomas in custody.

*Id.* at 13.

The Court then heard from Pretrial Services, which noted that the supplemental report contained a direct quote from the assessment (the quote included above) and indicated that United States Supervising Probation Officer Jennifer Van Flandern was present in case the Court had any questions. *Id.* at 14. The Court did not.

Defense counsel then addressed the concern both the government and Pretrial Services expressed about how Mr. Thomas did on state DOC supervision as an indicator of whether he could be safely released to federal pretrial supervision, stating:

Just briefly, Your Honor, since DOC supervision was raised and sort of concerns about people having violations on DOC supervision. I think we quite often in the conviction context, and I think quite rightfully, hear discussion of how vastly superior our Pretrial Services and probation [*sic.*] office is to DOC. I think that is particularly meaningful for someone as young as Mr. Thomas and with a plan like this. So I don't think someone having violations on DOC is indicative of the fact that with the additional support and supervision our probation office provides that they cannot be safely maintained in the community.

*Id.* at 15.

DEFENSE MOTION TO REVOKE
DETENTION ORDER
(*U.S. v. Thomas*, CR22-198-RSL) - 12

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

At the hearing's conclusion, the Magistrate Judge indicated it was denying the defense's request to reopen and release Mr. Thomas. *Id.* at 16. It also noted that its decision is reviewable by this Court. *Id.*

## III. IMPLICIT BIAS

Counsel submits that unconscious bias impacted Mr. Thomas's second detention hearing. In raising this issue for the Court and parties' discussion, counsel wants to be clear and explicit that this is not a suggestion that anyone is acting in bad faith, with conscious or overt bias, or intentionally trying to treat Mr. Thomas differently. Quite to the contrary. By its very nature, unconscious bias operates below our conscious awareness. As this Court's Unconscious Bias juror video reminds us:

> It's been proven that most biases happen at an unconscious level. In fact, researchers have found that unconscious bias is a part of how we all think and process information…
>
> The fact is, most of us don't want to judge others unfairly or be guided by unconscious bias when making decisions. But simply having good intentions does not work. Neither does ignoring things like age, race, or gender, because unconscious bias really does happen without us realizing it…
>
> The fact is honest, intelligent, really good people are impacted by unconscious bias every day. The more aware of it we are, the better…

Counsel submits this is what is happened in the hearing below in the treatment of Mr. Thomas's trauma history and treatment needs; the allegation of an absence of nexus between his self-medicating drug use and offense conduct, prior and currently alleged; and whether he presents such an immitigable danger that *no* combination of conditions could "reasonably assure" his return to court and community safety.

Being influenced by unconscious bias is not something any of us *wants* to do. Nevertheless, it is something that we all *in fact* do, and do more regularly than our conscious, thoughtful, moral minds are comfortable confronting. As all parties know,

DEFENSE MOTION TO REVOKE
DETENTION ORDER
(*U.S. v. Thomas*, CR22-198-RSL) - 13

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

however, proceedings before this Court are not about comfort, but justice and adherence to the law—with attention to applying legal standards even-handedly and making factual inferences with assiduous care to avoid unconsciously relying on the caricatures of certain groups that imbue this nation's racist history.

Counsel is confident that all parties want to see justice done. It bears emphasis, again, that counsel believes and assumes that all parties have acted in good faith throughout this case. But for that belief, it would be difficult for counsel to raise this issue here without fear that counsel's words would be held against Mr. Thomas. The defense has faith in this District's commitment, and the commitment of all parties working within it, to rooting out and addressing implicit bias. Counsel recognizes that this is a charged issue to raise, and raises it not in an effort to point fingers or embarrass anyone, but with sincere hope that it will lead to productive introspection, discussion, and re-consideration of conclusions drawn negatively against Mr. Thomas in ways that reflect implicit bias at work.

If we are to continue to grow in our practice and the dispensation of justice, and if we are to continue to grow as a collaborative community of professionals leading the way in educating the broader court community about unconscious bias, then we must be able to have the hard conversations in situations such as these. We cannot call ourselves courageous in this arena unless we allow ourselves to be vulnerable and do the hard work in our own cases. Believing we all have that courage, and with this goal of collaboration toward growth in mind, counsel raises the issue here.

A.     Dehumanization and the "Adultification" of Children of Color

Underpinning our unconscious bias is a long history of racial injustice and stereotypes about different racial groups in this country—a history with which all of the parties are familiar. Enduring from that history are negative stereotypes about African-American young men. We are quick as a society to assign labels like "dangerous" and

DEFENSE MOTION TO REVOKE
DETENTION ORDER
(*U.S. v. Thomas*, CR22-198-RSL) - 14

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

"predatory" to men of color; and we are terrible as a society at acknowledging their emotional and psychic pain and approaching it with empathy and compassion. Although not specific to the mental health context, research around disparities in a physical health setting is worth noting here—specifically, medical pain management. Research has demonstrated the impact of implicit bias in the persistence of racial disparities in pain management for Black people, with Black people receiving inferior pain management care. As one University of Washington physician described:

> Other findings are equally worrisome. In a 2012 study, my colleagues and I found a correlation between pediatricians' implicit (unconscious) racial biases and how they treated pain in a simulated African-American or white teenager following surgery: As the strength of provider implicit bias favoring whites increased, the likelihood of prescribing appropriate pain medication decreased only for the black patient. What's more, a meta-analysis of 20 years of studies covering many sources of pain in numerous settings found that black/African American patients were 22% less likely than white patients to receive any pain medication.
>
> Racial and ethnic disparities in pain treatment are not intentional misdeeds: health care providers do not decide that some groups deserve pain relief while others should suffer. Instead, inequities are the product of complex influences, including implicit biases that care providers don't even know they have.

Janice A. Sabin, PhD, MSW, "How We Fail Black Patients in Pain," https://www.aamc.org/news-insights/how-we-fail-black-patients-in-pain (Jan. 6, 2020); *see also, e.g.*, Antoinette Schoenthaler, EdD, and Natasha Williams, EdD, "Looking Beneath the Surface: Racial Bias in the Treatment and Management of Pain," https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2793179 (June 9, 2022); Kelly M. Hoffman, et al., "Racial Bias in Pain Assessment and Treatment Recommendations, and False Beliefs about Biological Differences Between Blacks and Whites," https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4843483/ (April 4, 2016). Although the studies address physical pain, the foundational emotional dehumanization

DEFENSE MOTION TO REVOKE
DETENTION ORDER
(*U.S. v. Thomas*, CR22-198-RSL) - 15

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

of Black people in this country that scaffolded the brutal atrocities of slavery and informs our implicit biases today gives reason for concern about this phenomenon in an emotional context.

One way in which research demonstrates this bias manifests is in the "adultification" of children of color—particularly Black children. *See, e.g.*, Amir Gilmore, "Antiblackness and the Adultification of Black Children in a U.S. Prison Nation," https://www.researchgate.net/publication/352106857_Antiblackness_and_the_Adultification_of_Black_Children_in_a_US_Prison_Nation (March 2021) ("As adultified Black youth, they lack autonomy and are not granted leniency to learn from their mistakes like their white peers. With their actions and intentions perceived as deviant, ill-willed, or hypersexual, Black children are susceptible to a wide range of violence from school punishment, the criminal justice system, sexual abuse and exploitation, and excessive police force.") (from abstract); Phillip Atiba Goff, PhD, and Matthew Christian Jackson, PhD, "The Essence of Innocence: Consequences of Dehumanizing Black Children," https://www.apa.org/news/press/releases/2014/03/black-boys-older (Feb. 24, 2014); Kim Taylor-Thompson, "Treating All Kids as Kids," https://www.brennancenter.org/our-work/analysis-opinion/treating-all-kids-kids (May 24, 2021). Acts by Black children and young adults are more readily perceived on both societal and individual levels as adult acts, with children of color not receiving the generosity of perspective with which we approach youthful decisions by white children. Put simply, we attribute poor decisions by white children to *childhood*; we attribute poor decisions by Black children to the *child*. Implicit bias influences us on a societal level to see reckless behavior or irresponsible decision-making by Black children as core character—who they will always be. It handicaps our ability to discern between the individual and a dangerous caricature implicit bias foists upon them.

DEFENSE MOTION TO REVOKE
DETENTION ORDER
(*U.S. v. Thomas*, CR22-198-RSL) - 16

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

As a nation, we have historically denied the humanity of men of color. We then deny their pain—that it is as deep and debilitating as our own. We fail to see their thoughtfulness, warmth, and compassion. We underappreciate their aspiration, striving, and potential. We have historically failed as a society to acknowledge, embrace, and celebrate boys and men of color as fully actualized human beings in the way we acknowledge people from the "majority culture." All of this history impacts our unconscious biases. Layering this onto the degree to which we as a society socialize our children against seeing men—all men—as emotional and empathetic creatures, and one is left with devastating, intersectional, unconscious bias.

## IV.    LEGAL STANDARD

### A.    The Bail Reform Act

As the Supreme Court held in *Salerno*, "[i]n our society liberty is the norm, and detention prior to trial . . . is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987). This presumption of release is encapsulated in the Bail Reform Act, 18 U.S.C. § 3142. The statute states that the Court "shall order" pretrial release, § 3142(b), except in certain narrow circumstances. Before a person may be detained, the government must show that a person poses a danger to the community by clear and convincing evidence, and it must show that a defendant poses a flight risk by a preponderance of the evidence. *United States v. Gebro*, 948 F.2d 1118, 1121 (9th Cir. 1991); 18 U.S.C. § 3142(f). Even if the Court determines under § 3142(c) that an unsecured bond is not sufficient, the Court "shall order" release subject to "the least restrictive further condition[s]" that will "*reasonably assure*" the person's appearance in court and the safety of the community. 18 U.S.C. § 3142(c)(1) (emphasis added). Under this statutory scheme, "it is only a 'limited group of offenders' who should be detained pending trial." *United States v. Shakur*, 817 F.2d 189, 195 (2d Cir. 1987) (quoting S. Rep. No. 98-225, at 7 (1984), *as reprinted in* 1984 U.S.C.C.A.N. 3182,

DEFENSE MOTION TO REVOKE
DETENTION ORDER
(*U.S. v. Thomas*, CR22-198-RSL) - 17

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

3189); *see also United States v. Byrd*, 969 F.2d 106, 109 (5th Cir. 1992) ("There can be no doubt that this Act clearly favors nondetention."). Even when a person is charged with a serious crime or has a significant prior convictions, there may be release conditions that will reasonably assure the safety of the community. *United States v. Dominguez*, 783 F.2d 702, 707 (7th Cir. 1986).

## B. This Court Considers Release De Novo

This Court's review of the Magistrate Judge's order denying Mr. Taylor's emergency motion for temporary release is de novo. 18 U.S.C. §§ 3145(b)–(c); *United States v. Koenig*, 912 F.2d 1190, 1192–93 (9th Cir. 1990). Specifically, this Court must review the evidence before the magistrate judge and any additional evidence proffered by the parties "and make its own independent determination whether the magistrate's findings are correct with no deference." *Koenig*, F.2d at 1193.

## V. STATISTICS SHOWING THAT IT IS RARE FOR PEOPLE ON BOND TO FLEE OR REOFFEND WHILE UNDER PRETRIAL SUPERVISION

It is not necessary to detain Mr. Thomas to meet the goals of the Bail Reform Act, which are to reasonably assure appearance in court and community safety. In this case, the Court should be guided by AO statistics showing that nearly everyone released pending trial in the federal system appears in court and does not reoffend. In fact, in 2019, 99% of accused persons released in federal court nationwide appeared for court as required, and 98% did not commit new crimes on bond. Exhibit 3 (AO Table H-15, December 31, 2019) (showing a nationwide failure-to-appear rate of 1.2% and a rearrest rate 1.9%).

//

//

DEFENSE MOTION TO REVOKE
DETENTION ORDER
(*U.S. v. Thomas*, CR22-198-RSL) - 18

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

Moreover, when release rates increase, crime and flight do not. A near-perfect compliance rate on bond is seen equally in federal districts with very high release rates and those with very low release rates.[8] Even in federal districts that release two-thirds of all accused persons on bond, fewer than 1% fail to appear in court and 2% are rearrested while released.[9] The below chart reflects this data:



The bond statistics for this district likewise strongly suggest that Mr. Thomas should be released. In this district, people released pretrial failed to appear for court

---

[8] The data showing near-perfect compliance on bond is illustrated in the chart above, "Federal Clients on Bond Rarely Flee or Recidivate." The districts with the highest and lowest release rates were identified using the version of AO Table H-14A for the 12-month period ending December 31, 2019. *See* Exhibit 4 at 2 (AO Table H-14A (Dec. 31, 2019)). The failure-to-appear and rearrest rates for these districts were calculated using Exhibit 3 (AO Table H-15). With regard to flight, the ten federal districts with the lowest release rates (average 26.00%) have an average failure-to-appear rate of 1.37%, while the ten districts with the highest release rates (average 65.58%) have an *even lower* failure-to-appear rate of 0.87%. *See* Exhibits 3 and 4. With regard to recidivism, the ten districts with the lowest release rates have an average rearrest rate on bond of 1.19%, while the ten districts with the highest release rates have an average rearrest rate of 2.29%. *See id*.

[9] *See id*.

DEFENSE MOTION TO REVOKE
DETENTION ORDER
(*U.S. v. Thomas*, CR22-198-RSL) - 19

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

only 0.5% of the time in 2019, and only 0.1% of people were rearrested on release. *See* Exhibit 3. Mr. Thomas must be released because the government has not established that he would be among the very few accused persons who fail to appear in court or who are rearrested on bond. Detaining him without such evidence violates his constitutionally protected liberty interest.

## VI.  RELEASE IS APPROPRIATE HERE

Gianni Thomas is 25 years old. His exemplary performance as an employee and his enrollment as directed in the STOP program reflect real and meaningful effort to better his life. He wants nothing more than stability and to be a present, loving father—a desire animated by his own loss as a child. He was working to change his life before his arrest in this case, and the relative weakness of the evidence for the second alleged incident here bears emphasis in that regard. Beyond that, however, the defense's proposed release plan far surpasses any level of treatment, support, and supervision Mr. Thomas has ever received in life—through the court system or otherwise.

If released directly to a 60–90 day inpatient substance use disorder and mental health treatment program, Mr. Thomas would not be back in the community until he had spent at least two months working on himself *full time*. While in treatment, he would be able to talk about the traumas he has endured and learn skills to effectively process their ongoing emotional impacts. This addresses directly what he has unsuccessfully tried to manage through self-medication with marijuana and alcohol. He would learn how those traumas can act as substance use triggers—what to be vigilant for and tools to process triggers when they arrive. The fact that Mr. Thomas's substance use disorder history is of marijuana and alcohol use makes this process all the more achievable—one blessing of his situation is that he is not contending with a fentanyl, heroin, or methamphetamine addiction.

DEFENSE MOTION TO REVOKE
DETENTION ORDER
(*U.S. v. Thomas*, CR22-198-RSL) - 20

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

During inpatient treatment and beyond, Mr. Thomas will continue to receive support, advice, and empathy from Zaheed Lynch's mentorship through Community Passageways. The guidance Mr. Lynch is able to provide is something for which Mr. Thomas has spent much of his life hungry—someone reliable he can trust, relate, and look up to; who sees his potential; and who is not asking him for anything. Mr. Lynch will also work to connect Mr. Thomas to other community resources. As noted in the Second Supplemental Pretrial Services Report, this includes referring Mr. Thomas to Good Intentions, which is a BIPOC-focused substance use and mental health treatment provider with which he can engage after completing inpatient treatment.

Mr. Thomas would also be subject to strict supervision by Pretrial Services—including home detention and marijuana testing. Unlike with DOC, which does not routinely test for marijuana use given its status in Washington State, federal supervision will involve multiple monthly tests for marijuana. A sober living house will perform additional tests beyond this. Moreover, federal supervision is simply better. Pretrial Services officers carry fewer cases and have more resources than DOC officers. Consequently, they build better relationships with closer monitoring and stronger relationships with the people they supervise. They can, and do, loop in the FPD for support and assistance where appropriate. Mr. Thomas's issues on DOC supervision simply do not mean it is impossible to safely release him to the community given how well Pretrial Services performs its function and the services the FPD has put in place beyond that.

Mr. Thomas would have a job to return to and community supports who have demonstrated that they will continue to "show up" for him—by coming to his court appearances and being reliably responsive to communications from the FPD. And, finally, he will continue to receive support from his case team at the FPD. In addition to

DEFENSE MOTION TO REVOKE
DETENTION ORDER
(*U.S. v. Thomas*, CR22-198-RSL) - 21

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

counsel, Mr. Thomas is working with a paralegal and an investigator from the FPD—both of whom have visited him at the Federal Detention Center and have provided emotional support through the arrest and detention litigation process. Mr. Thomas has developed trust in the defense team during his time at the FDC and now regularly calls the office to speak with a member of the case team when he is down or stressed and needs emotional support.

Mr. Thomas has demonstrated an eagerness to engage with people who he can tell care about what happens to him. If released, he has multiple relationships in place to buoy him as he works on himself and his future. He would also be strictly supervised while he receives services targeted toward his needs and particular challenges. The Court could also set periodic status conferences to track his progress and keep his case even more closely monitored. The intensive treatment and supervision plan the defense proposes will reasonably assure Mr. Thomas's return to court and community safety. He should be released to begin inpatient treatment.

DATED this 28th day of December 2022.

Respectfully submitted,

s/ *Vanessa Pai-Thompson*
Assistant Federal Public Defender
Attorney for Gianni S. Thomas

DEFENSE MOTION TO REVOKE
DETENTION ORDER
(*U.S. v. Thomas*, CR22-198-RSL) - 22

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**