```
 1                    UNITED STATES DISTRICT COURT

 2              FOR THE WESTERN DISTRICT OF WASHINGTON

 3                            AT SEATTLE

 4   _____

 5   UNITED STATES OF AMERICA,      )

 6               Plaintiff,         )  No. CR 22-5102 CVB

 7        vs.                       )

 8   NATALIE F. BAETA,              )

 9               Defendant.         )

10   _____

11                         DETENTION HEARING

12          The Honorable Brian A Tsuchida Presiding

13                       December 13, 2022

14   _____

15

16

17

18

19

20

21   TRANSCRIBED BY:  Marjorie Jackson, CET

22                    Reed Jackson Watkins, LLC

23                    Court-Approved Transcription

24                    206.624.3005

25
```

```
 1                       A P P E A R A N C E S
 2
 3   On Behalf of Plaintiff:    CECELIA Y. GREGSON
 4                              United States Attorney's Office
 5                              700 Stewart Street, Suite 5220
 6                              Seattle, Washington 98101
 7
 8
 9   On Behalf of Defendant:    VANESSA PAI-THOMPSON
10                              Federal Public Defender's Office
11                              1601 Fifth Avenue, Suite 700
12                              Seattle, Washington 98101
13
14   Also Present:
15   Erin O'Donnell, Pretrial Services
16   Cindy Stewart, Paralegal with FPD
17   Deborah Malcolm, Investigator with FPD
18   Zaheed Lynch, Community Passageways
19
20
21
22
23
24
25
```

```
 1                          -o0o-
 2                     December 13, 2022
 3
 4        THE CLERK:  All right.  United States District Court
 5     for the Western District of Washington is in session,
 6     The Honorable Brian A. Tsuchida presiding.
 7        THE COURT:  Good morning.  Please be seated.
 8        THE CLERK:  Your Honor, the matter before the Court is
 9     scheduled for a motion to review detention, Case No.
10     CR 22-198, assigned to Judge Lasnik, United States of
11     America v. Gianni Sharpa Thomas.
12        Counsel, please make your appearances.
13        MS. GREGSON:  Good morning.  Cecelia Gregson for the
14     Government.
15        THE COURT:  Ms. Gregson, good morning.
16        MS. PAI-THOMPSON:  Good morning, Your Honor.  Vanessa
17     Pai-Thompson on behalf of Mr. Thomas, who is present
18     with me at counsel table.  Also at counsel table is
19     Federal Public Defender Paralegal, Cindy Stewart.  And
20     then present in the audience today we also have Federal
21     Public Defender Investigator, Deborah Malcolm, as well
22     as a representative from Community Passageways, Zaheed
23     Lynch, who the Court has heard about.  And then also
24     community supports who were present for Mr. Thomas at
25     his initial hearing, as well.
```

```
 1            THE COURT:  Thank you very much, Ms. Pai-Thompson and
 2       Mr. Thomas.  Good morning.  We're here on your motion to
 3       reopen.  So Ms. Pai-Thompson, I want to hear from you
 4       folks first.
 5            MS. PAI-THOMPSON:  Thank you.  Thank you, Honor.
 6            So I would like to begin by just outlining the release
 7       plan that we propose and then I will address some of the
 8       notes that Pretrial Services has made, specifically with
 9       request -- request? --  with respect to the treatment
10       component and mental health component and, which,
11       candidly, I find a little bit troubling for reasons that
12       we'll get into.
13            So our proposal to the Court is that Your Honor
14       release Mr. Thomas directly to inpatient treatment.  So
15       we're not proposing that he be released today.  As part
16       of our work with him, he underwent an evaluation and has
17       been accepted to North Sound Behavioral Health, which is
18       an inpatient, residential treatment program run by
19       Pioneer Human Services.
20            The program into which he's been admitted is a
21       long-term co-occurring treatment program.  So it's a
22       program that's focused both on substance use disorder as
23       well as mental health treatment.  It is 60 to 90 days in
24       length.  And as with other programs of this length,
25       there is the initial assessment, and then whether it
```

```
 1    winds up being 60 or 90 kind of depends upon progress.
 2    But we do always have -- we are able to communicate with
 3    them about how long someone will be in the program.
 4       I recently had a client go through this program, and I
 5    found it incredibly valuable and more culturally
 6    informed than a lot of kind of local treatment programs.
 7    So I did provide information about that to Pretrial
 8    Services (inaudible) as it is a smaller facility.  So
 9    it's only 16 beds, which allows for much more intensive
10    treatment.
11       It is in Everett, which for, Mr. Thomas, also puts him
12    closer to his son, who for him is a major motivation in
13    life.
14       After he completes treatment, we would then have him
15    transition into sober living housing.  We don't have the
16    specific housing placement yet because it's just too far
17    out to do that.  We can't -- there aren't places that
18    would hold a bed for 90 days, but that treatment is
19    readily available.  I mentioned also to Pretrial
20    Services that if, for some reason, there was a need for
21    kind of gap housing for a couple of weeks, Mr. Thomas is
22    more than amenable to go into the halfway house, which
23    we obviously don't use as long-term placement on
24    Pretrial Services supervision.  I think generally the
25    limit is up to 30 days.  But given his employment
```

```
 1          history and his ability to go back to his job -- not
 2          just ability, but how eager his employer is to have him
 3          back, which I'll address, there shouldn't be any issue
 4          at all getting him into a sober living facility.
 5             The sober living facility would provide the additional
 6          benefits, as the Court knows, of a curfew, strict rules,
 7          drug testing, in addition to the drug testing that
 8          Pretrial Services would do, as well as what any
 9          treatment provider would do, because we would fully
10          expect that after he completes treatment through North
11          Sound Behavioral Health, that he would be referred for
12          aftercare, outpatient treatment.
13             And then the Court has information in the Pretrial
14          Services report about culturally informed counseling
15          that we would expect he would do either as the mental
16          health component or in addition to further mental health
17          treatment, depending upon what the ultimate aftercare
18          recommendations are from North Sound Behavioral Health.
19             Another, I think, important piece about the
20          recommendation that he be -- that he move to sober
21          living housing rather than moving home with family is
22          Mr. Thomas's reflection, his reflection that he really
23          needs to be in a position where there aren't
24          expectations and kind of demands on him the way that
25          there are when he's living at home with family and that
```

1    he really needs to prioritize himself and just getting
2    stable, getting solid and doing all of the things that
3    the Court expects.
4        In addition to this, Your Honor, Mr. Thomas -- when
5    we were last before the court, we were proposing that
6    Mr. Thomas would participate with either Community
7    Passageways or with the YMCA's alive and Free program,
8    but he was not yet accepted into either.  He is now
9    actively working with Community Passageways.  And his
10   mentor, Zaheed Lynch, is present in court should Your
11   Honor have any questions for him.
12       As I believe the Court is aware, Community Passageways
13   is a community-based program that works with young
14   people who have lived through the types of experiences
15   Mr. Thomas has had.  They provide mentorship, support,
16   referrals, and it has been great to see Mr. Thomas and
17   Mr. Lynch begin to develop what I think is going to be a
18   very productive working relationship.
19       I can tell the Court, also, that I was especially glad
20   when Mr. Thomas was assigned to work with Mr. Lynch.  I
21   don't know whether the Court is aware, but I, through
22   our office's community engagement work, lead civics days
23   at high schools in Kent, in the Kent School District.
24   And as part of that program, we have a panel with young
25   people from Community Passageways.  And then there is

1    a -- one of the mentors who comes and escorts them.  It
2    just happened to be the case that as we were doing this
3    sort of general application process for Mr. Thomas, that
4    Mr. Lynch was actually the mentor who accompanied all of
5    the young people to the panels for Civics Day, and in
6    one case was our panel when a young person was not able
7    to ultimately make it.
8       And in having the opportunity to hear him talk with
9    groups of young people about his background, what drove
10   him when he was in college to want to do the type of
11   work that he is doing, what leads him to find it so
12   fulfilling and his approach to working with young people
13   and where they are, I really -- I feel very confident
14   that Mr. Thomas is in good hands.
15      And, again, he's certainly happy to address the Court,
16   should Your Honor have questions for him specifically.
17      As I indicated, Mr. Thomas does still have a job
18   waiting for him.  I think the fact that his employer is
19   a manager at a retail T-Mobile store is still, all this
20   time later, so eager to have him back really speaks to
21   his character, his work ethic.  Your Honor heard from
22   his boss, Ron Larson, at the last hearing.
23      Mr. Larson wanted to come to today's hearing.
24   Unfortunately, they have a mandatory -- they call it
25   required count by corporate that required him to be in

1   the store today.  And so he asked me to inform the Court
2   that his, quote, is "My feelings and desire to have
3   Gianni work for me have not changed," and that the only
4   reason he is not here today is because of a work
5   obligation that he can't get around.
6       So once he is through treatment and is able to go back
7   to work, Mr. Thomas, based upon the income that he was
8   making there, will be able to pay to live in a sober
9   living facility, would be able to contribute to the cost
10  of the bond to the degree that's something that the
11  Court requires.  And, again, would not be in the
12  community until after he had been released directly to
13  treatment from the Federal Detention Center.  We
14  continue to recommend location monitoring as a condition
15  of the bond.
16      And I think that the treatment program that we are
17  recommending to the Court is absolutely an appropriate
18  treatment.  I, as I said, was a little troubled to see
19  in the Pretrial Services report a sort of parsing -- and
20  as I read it, at least -- suggestion that perhaps the
21  mental health component wasn't something that was
22  supported by the evaluation, or that my perception was
23  that we were perhaps shoehorning him into a specific
24  program.
25      As the Court knows and Pretrial Services knows from

1    our earlier interviews, Mr. Thomas is someone who has
2    experienced profound trauma in his life.  His father was
3    killed by police in a very violent fashion.  He has
4    experienced personal trauma himself.  And I think that
5    the idea that there is no connectedness to his trauma
6    experiences, to his prior cases, to his numbing through
7    alcohol and drugs is not something that I think the
8    record supports.
9       What the Court has before it is a young person who has
10   a huge amount of potential, is just an absolute joy to
11   work with, has had a lot that he has been trying to
12   navigate on his own, that he was put in a position to be
13   essentially kind of the head of the household at a time
14   when what he really needed was support and help.  He has
15   shown that he was amenable to treatment.  As indicated
16   during the last hearing, his grandmother did send all of
17   the children to mental health counseling after his
18   father was killed, but that was not something that was
19   maintained.
20      George Floyd's murder was incredibly triggering for
21   him, given the similarities between that and the way
22   that his father died and -- I would just leave it that
23   it concerns me that the need for both mental health
24   treatment and drug treatment and the connection to
25   offenses in the past, to challenges that he's had, is

1    not being as openly recognized.
2       We have, because of his needs, provided the Court with
3    the most intensive release plan I have proposed to the
4    Court in some time, addressing, recognized to be very
5    real needs.  We are not asking the Court to speculate
6    about when he will be in treatment, where he will be in
7    treatment, if he will get into Community Passageways, if
8    he will be employed.
9       The only open question is what specific sober living
10   house he will go to and whether he might need a couple
11   of weeks in a halfway house in between.  But all of the
12   concerns that are presented by this case are addressed
13   by the release plan.  And I would just say to the Court
14   that he is very young and is in a position where he is
15   incredibly open to and hungry for help.  He is someone
16   who his boss described as a joy to work with and
17   reliable and always there on time for his shifts and
18   never losing his patience or his temper with coworkers
19   or with customers, even in a difficult retail setting.
20      I will tell the Court at the juncture that we are at,
21   I don't feel comfortable getting into specifics, but as
22   we continue to investigate this case, Mr. Thomas's
23   defense to the second alleged incident is all the more
24   strong.  And this just isn't a case where I think we can
25   say that there are no conditions or combination of

1    conditions that would reasonably assure his return to
2    court and the safety of the community.
3         I will remind the Court also that when we were last
4    before Your Honor, Mr. Thomas had a condition requiring
5    that he enroll in the STOP program.  We were able to
6    confirm that he had enrolled in STOP despite many emails
7    by Ms. Stewart to them trying to get just more
8    information about that.  They just can be a little bit
9    difficult to communicate with, but they did confirm to
10   us that he had gone through the evaluation process that
11   he needed to, as directed.  We would have no objection
12   to that also being included as a condition of his bond
13   in addition to being a DOC condition.
14        But with the plan that the Court has before it, I
15   submit to the Court and feel very strongly that
16   Mr. Thomas can be safely released to the community
17   again, directly to inpatient treatment for 60 to 90 days
18   while working with Community Passageways.  Because they
19   are working with him through the case team, they will be
20   able to continue to meet with him while he is in
21   inpatient treatment, and then again releasing to a sober
22   living facility with ongoing supervision.
23        THE COURT:  All right.  Thank you very much.
24        And, Ms. Gregson.
25        MS. GREGSON:  Thank you, Your Honor.

1          First off, I'd like to just say that I do commend
2     Ms. Pai-Thompson's zealous advocacy for Mr. Thomas, and
3     I appreciate that he's very youthful.  But,
4     unfortunately, my job is to look at his history and the
5     conduct that he is charged with committing and his risk
6     to the community.  And because of those things, I cannot
7     join defense counsel's requests.
8        I do think that, in addition to very concerning crimes
9     that are charged, having been committed while on
10    supervision with Department of Corrections, the other
11    sort of large pause for me is that I see a lot of no
12    contact order violations and protection order
13    violations.  And those, from a prosecutorial
14    perspective, are always markers of either an inability
15    or an unwillingness to follow court conditions.  And
16    there would be so many that would need to be cobbled
17    together to make this a cohesive, doable plan.
18       I just think the combination of the history, being on
19    supervision and these violations, repeated violations
20    of no contact orders, present a situation where we are
21    requesting the Court maintain Mr. Thomas in custody.
22       THE COURT:  All right.
23       MS. GREGSON:  Thank you.
24       THE COURT:  And I guess I should hear from the
25    Pretrial Office if the office has anything to add.  And

```
 1          I did look at the supplemental report and some of the
 2          concerns raised about the past history, as well as the
 3          connection to the treatment plan.
 4            But go ahead.
 5            MS. O'DONNELL:  Yes, thank you, Your Honor.  Erin
 6          O'Donnell with Pretrial Services.  Just in regards to or
 7          in response to defense counsel's concerns in
 8          paragraph 4, the last sentence speaks of a note by
 9          Mr. Currie, who completed the assessment, that he does
10          not present to need services in the mental health
11          dimension.  That was a direct quote from the assessment.
12          I did ask supervisor and certified substance use
13          counselor with the state, Jennifer Van Slander
14          [phonetic] to come to court with us in case Your Honor
15          had any specific questions or more questions about the
16          assessment and how that goes.  But I just wanted to note
17          for the Court that that was a direct quote from his
18          assessment.
19            THE COURT:  All right.  So anything further?
20            MS. GREGSON:  I don't believe I have anything further,
21          Your Honor, no.
22            THE COURT:  Thank you.  Ms. Gregson, I thought you
23          were going to say something so --
24            MS. GREGSON:  No, I just couldn't see Ms. O'Donnell.
25            THE COURT:  Ms. Pai-Thompson.
```

1         MS. PAI-THOMPSON:  Just briefly, Your Honor, since DOC
2    supervision was raised and sort of concerns about people
3    having violations on DOC supervision.  I think we quite
4    often in the conviction context, and I think quite
5    rightfully, hear discussion of how vastly superior our
6    Pretrial Services and probation office is to DOC.  I
7    think that is particularly meaningful for someone as
8    young as Mr. Thomas and with a plan like this.  So I
9    don't think that someone having violations on DOC is
10   indicative of the fact that with the additional support
11   and supervision that our probation office provides that
12   they cannot be safely maintained in the community.
13      And, again, I would just note that Mr. Currie, who did
14   the assessment with Mr. Thomas -- one, the assessment
15   was actually done earlier on prior to us -- like, I
16   think I even let the Court know, right, that it was in
17   process at the time, and so there is more information
18   that we have.  Mr. Currie has been involved and looped
19   in, as Ms. Stewart and I have also been communicating
20   with the treatment provider about what plan was in
21   place.  And he did agree that this was an appropriate
22   placement for Mr. Thomas.
23      THE COURT:  All right.
24      So, Mr. Thomas, this is a very difficult case and a
25   difficult decision.  And sadly, I'm going to turn down

1    your request to reopen.  And I know your lawyer has a
2    tremendous work-up here in terms of the treatment plan.
3    And I know all of the plans that she's always presented
4    usually have the same type of level of preparation.
5    They're never flimsy kinds of plans.  But, you know, I
6    think one of the things that's so difficult in this
7    case, at least for myself, is that your history really
8    starts as soon as you're almost like an adult.  And it's
9    serious history.  It's serious history even before
10   George Floyd and continued to be serious history.
11      And although the Department of Corrections doesn't
12   have as many resources to do the supervision, I think
13   the concern, I know was argued earlier, is that when
14   there are actual new criminal charges on supervision,
15   that's always like a very, very challenging problem.
16   And, you know, I know your lawyer is saying you're at
17   this point where you're suddenly going to change.  You
18   got seven years of criminal history, but if you get out,
19   you're going to change.  But the history is what it is,
20   and so I'm going to deny the request to reopen.
21      My decision is just a magistrate judge's decision, so
22   it's always reviewable by a district judge so you always
23   have that option, too.  But in the meantime, sadly,
24   you're going to remain in custody until the case is
25   resolved.

```
1              All right.  Mr. Gregson, Ms. Pai-Thompson, anything
2       further?
3              MS. PAI-THOMPSON:  No, Your Honor.  Thank you.
4              MS. GREGSON:  Not at this time. Thank you.
5              THE CLERK:  All rise.  Court is in recess.
6                       (Conclusion of hearing)
7
8
9    /s/ Marjorie Jackson, CET
10   AAERT Certified Electronic Transcriber
11   Reed Jackson Watkins, LLC
12   Court Approved Transcription Company
13   800 5th Avenue, Suite 101-183
14   Seattle, Washington 98101
15   206.624.3005
16
17
18
19
20
21
22
23
24
25
```