1          UNITED STATES DISTRICT COURT

2     FOR THE WESTERN DISTRICT OF WASHINGTON

3                  AT SEATTLE

4    _____

5    UNITED STATES OF AMERICA,        )

6              Plaintiff,        )   No. CR 22-5102 CVB

7         vs.                    )

8    NATALIE F. BAETA,                )

9              Defendant.        )

10   _____

11                 DETENTION HEARING

12    The Honorable Brian A Tsuchida Presiding

13               November 1, 2022

14   _____

15

16

17

18

19

20

21   TRANSCRIBED BY:  Marjorie Jackson, CET

22               Reed Jackson Watkins, LLC

23               Court-Approved Transcription

24               206.624.3005

25

```
 1                          A P P E A R A N C E S

 2

 3   On Behalf of Plaintiff:    BRIAN WYNNE

 4                              United States Attorney's Office

 5                              700 Stewart Street, Suite 5220

 6                              Seattle, Washington 98101

 7

 8

 9   On Behalf of Defendant:    VANESSA PAI-THOMPSON

10                              Federal Public Defender's Office

11                              1601 Fifth Avenue, Suite 700

12                              Seattle, Washington 98101

13

14   Also Present:

15   Erin O'Donnell, Pretrial Services

16   Cindy Stewart, Paralegal with FPD Office

17   Ronald Larson, Employer of Defendant

18   Grandmother of Defendant (no name provided)

19   Friend of Defendant (no name provided)

20

21

22

23

24

25
```

1                          -o0o-

2                   November 1, 2022

3

4      THE CLERK:  Your Honor, the next matter before the

5      Court is scheduled for a detention hearing, Cause No.

6      MJ 22-491, United States of America v. Gianni Sharpa

7      Thomas.

8      Counsel, please make your appearances.

9      MR. WYNNE:  Good afternoon, Your Honor.  Brian Wynne

10     on behalf of the United States.

11     THE COURT:  Mr. Wynne, good afternoon.

12     MS. PAI-THOMPSON:  And good afternoon, Your Honor.

13     Vanessa Pai-Thompson on behalf of Mr. Thomas, who's

14     present with me at counsel table.  Also present at

15     counsel table is Federal Public Defender Paralegal,

16     Cindy Stewart.

17     THE COURT:  And, Ms. Stewart and Ms. Pai-Thompson,

18     good afternoon.

19     MS. STEWART:  Good afternoon, Your Honor.

20     THE COURT:  Mr. Thomas, good afternoon.  We're here

21     for a detention hearing.  And I did get an updated

22     Pretrial Services report.

23     And I guess I should first hear from the Government

24     and then Ms. Pai-Thompson.

25     MR. WYNNE:  Thank you, Your Honor.  The Government is

1    seeking detention in this matter.  Mr. Thompson [sic] is

2    an individual who is on community custody with the

3    Department of Corrections when he was released from

4    prison in February of 2022.  Shortly thereafter, he

5    engaged in repeated behaviors where he has been found to

6    be in possession of loaded firearms.

7      The Government believes that Mr. Thomas's history

8    is -- put it this way, Your Honor -- the Government

9    believes that he is both a flight risk and a danger to

10    the community.

11      Turning first to the flight risk, as set forth in the

12    Pretrial Services report, the defendant does have a

13    history of warrants, as well as a history of attempting

14    to evade apprehension.  With respect to warrants, he has

15    seven warrants on previous cases for failing to appear

16    and one DOC warrant.

17      He also, as I have noted, has a history of attempting

18    to evade apprehension.  Looking back at his criminal

19    history, starting in 2017, under his conviction for

20    Robbery in the Second Degree, in that particular case --

21    and defense counsel has a copy of the Certification for

22    Determination of Probable Cause for this case and the

23    other cases I will reference.  In that case, the

24    defendant was traced back to his residence.  Officers

25    went to that particular place, knocked on the door, and

1    the defendant's grandfather indicated that the defendant

2    was not present.  Meanwhile, the defendant ran out the

3    back door and had to be apprehended on foot.

4        In 2020, the offense for which Mr. Thomas was on

5    community custody, after he assaulted the victim

6    repeatedly, a witness tried to call 911 to have police

7    respond.  Mr. Thompson -- excuse me -- Mr. Thomas took

8    the phone away from that witness.  Eventually, she was

9    able to get it back and call 911 -- able to call 911,

10   and the defendant then fled the scene at that particular

11   apartment, as well.

12       Also, according to Pretrial Services, on one other

13   occasion, Mr. Thomas evaded DOC apprehension by fleeing

14   in a vehicle.  He also made reference to the fact that

15   he was armed with a pistol or a firearm of some sort

16   when he said that he had "a heater."  That was what

17   Officer -- DOC Officer Conaty understood that comment to

18   mean.

19       So the defendant does have a history of fleeing from

20   apprehension, as well as not appearing before courts.

21   So that would be a basis for this Court to hold

22   Mr. Thomas.

23       But the Government's greatest concern is for the

24   safety of the community.  As I've already alluded to,

25   the defendant has prior convictions for Robbery in

1 the Second Degree, Domestic Violence; Unlawful

2 Possession of a Firearm and Felony Violation of a No

3 Contact Order for domestic violence.

4  The facts for that most recent conviction, the Felony

5 Violation of a No Contact Order violation are, frankly,

6 chilling.  The defendant entered into an apartment where

7 the mother of his child resided with her sister.  Inside

8 that apartment, he repeatedly assaulted her, causing

9 lacerations to the back of her head and a contusion to

10 her face that led officers who were responding almost

11 immediately thereafter to believe that she had a

12 fractured cheekbone.  The swelling was that bad that

13 immediately.

14  He then, as I've already alluded to, attempted to

15 prevent a witness from calling 911.  And then after that

16 witness called 911, he punched the victim so hard that

17 she lost consciousness.  The witness believed that her

18 sister had been knocked out, as she called it, for some

19 matter of minutes.  And he did all of this in front of

20 the victim's nine-year-old -- or, excuse me,

21 nine-month-old daughter and their two-year-old, then

22 two-year-old son.

23  He was sentenced to 29 months in prison and 12 months

24 of community custody.  He was released from prison and

25 started on community custody with the Department of

1    Corrections in February of 2022.  It was only a few

2    months later that he started possessing, or there is

3    evidence of him starting to possess firearms.

4      As this court knows, there were, in May of 2022,

5    videos of the defendant holding on to what officers

6    believed to be real firearms.  Then in May, on May

7    23rd of 2022, he was arrested after just being in a

8    vehicle. He was seen by arresting officers reaching

9    down behind the front passenger seat.  He got out of

10   that vehicle, and then a search of that vehicle revealed

11   that there was, in fact, a loaded firearm with one round

12   in the chamber in that gun that was found where he was

13   moving.

14     They also searched that vehicle and found a drum

15   magazine in the trunk of the vehicle, which shows that

16   he -- or someone -- and the Government's argument would

17   be that he was in possession of an item that allowed for

18   him to have a high-capacity magazine added to this

19   particular semiautomatic firearm.

20     Then just a few months later, he was in possession of

21   a firearm again.

22     September 8th of 2022, he was stopped in a vehicle.

23   Inside that vehicle when it was searched for an

24   inventory search, officers found a semiautomatic

25   9-millimeter in the center console.  There was a

1      magazine next to it that was loaded.  And then behind

2      the passenger seat in what appears to be the pouch in a

3      position where the driver could easily reach, there was

4      another 9-millimeter pistol.  This one was, again,

5      loaded with a round in the chamber.

6         Additionally, Your Honor, as Pretrial Services has

7      noted, the defendant self-reports having consumed, on

8      average, a bottle of tequila a day, which certainly

9      gives the Government concerned about his capacity to

10     follow through on promises that he would make to this

11     court.

12        And I would also note that he's a known member of a

13     group with ties to violence.

14        The Government believes that, given this entire

15     picture of an individual who, again, was on community

16     custody, who was under supervision at the time where he

17     has been repeatedly possessing firearms, the Government

18     believes that there is no conditions that can be set

19     forth by this court to ensure the safety of the

20     community and to ensure that he will appear.

21        So the Government does ask this court to detain

22     Mr. Thomas pending adjudication.  Thank you, Your

23     Honor.

24        THE COURT:  Ms. Pai-Thompson, please go ahead.

25        MS. PAI-THOMPSON:  Thank you. Your Honor.

```
 1        I do, before I begin my remarks, just want to
 2   acknowledge in the courtroom, Mr. Thomas's grandmother.
 3   Also his employer, whose name is listed in the Pretrial
 4   Services report, as well as a friend, who is actually
 5   his brother's girlfriend, who helped him get the job
 6   that he has now.  I did need just a moment to check in.
 7   I believe that it may be that we ask his employer to
 8   address the Court.
 9        I think that one thing that has really shown to me,
10   as I've gotten to know Mr. Thomas, is really just how
11   exceptionally warm he is and how much the job has meant
12   to him, how reliable he's been.  I think it has been --
13   it's been a big deal for him, for for lack of a better
14   way to describe it, and I think has given him a lot of
15   structure and feelings of kind of support and validation
16   that I think are meaningful to the Court's decision
17   here.
18        I think particularly, given the types of hours that he
19   works and the number of days a week that he works, that
20   his boss at this point is a really meaningful social
21   contact.  I don't need to tell the Court that it is rare
22   that a boss will even get on the phone to confirm to
23   Pretrial Services that someone is an employee -- or at
24   least somewhat uncommon, much less show up in court
25   prepared to address the Court and to talk about, in this
```

1    case, the young man who is before Your Honor.

2      So the Court has the memorandum that we filed and the

3    conditions that we have proposed.  I do have some

4    updates that --

5      (Coughing).  I'm sorry, Your Honor, I'm going to grab

6    some water really quickly.  Sorry about that. I'm

7    getting over a cold.

8      So in addition to the information that is indicated in

9    the memorandum and that the Court has through the

10   Pretrial Services report, I can confirm to the Court

11   that Mr. Thomas did complete the substance use disorder

12   evaluation this morning.  We don't yet have the written

13   report in hand, but based upon a conversation with the

14   provider, I think the recommendation there will be to

15   intensive outpatient treatment, which Valley Cities is

16   prepared to provide, or is well suited to provide. That

17   evaluation was done by Alvin Currie with Sunrise

18   Centers, which is a known provider who we regularly have

19   conduct evaluations and whose evaluations comply with

20   all of the necessary sort of King County components in

21   order for people to be accepted in treatment, and that

22   treatment covered either by Apple Health or by their

23   their health insurance.

24     So we anticipate if the Court were to release

25   Mr. Thomas today to an appearance bond, that we would

1     get him into Valley Cities, essentially immediately,

2     with that evaluation.  We should have the final written

3     evaluation by tomorrow to be able to refer him this

4     week.

5        Part of the reason that I -- or not part of the

6     reason -- the primary reason that I recommend Valley

7     Cities and am seeking to refer him there -- and this is

8     a provider that probation works with a lot as well -- is

9     that they do a very good job of coordinating both

10    substance use disorder treatment and mental health

11    treatment.

12       Mr. Thomas is someone who suffered a really just

13    tremendous loss in 2007 when his father was killed by

14    law enforcement.  And as the family has continued to

15    contend with that loss through civil litigation related

16    to it, and then also was really re-triggered in many

17    ways by George Floyd's murder, that Mr. Thomas

18    recognizes that mental health treatment in addition

19    to substance use disorder treatment will be helpful to

20    him.

21       I also note that the Court doesn't have someone before

22    it who has shown ever an unwillingness to meaningfully

23    engage in mental health treatment or a family that is

24    not looking out for his need to be in mental health

25    treatment.  His grandmother, who is present in court

1    today, made sure that all of her grandchildren received

2    counseling after Mr. Thomas's father was killed.

3      Mr. Thomas is also engaged in counseling and taking

4    necessary medication.  And when we talk about that, he's

5    not someone who talks about it with the, "Oh, I didn't

6    like that and it had side effects, so I don't want to do

7    that again."  It was -- he graduated from school.  It

8    was prescribed to him related to school, but he is

9    somebody who has described and I think demonstrated his

10   willingness to engage with treatment and to follow

11   recommendations.  And we are recommending both the drug

12   treatment and the mental health component and have

13   tried to jumpstart that process by having the evaluation

14   done.

15     We had hoped to be able to have it done at the FDC

16   yesterday so we would have the report in hand today, but

17   unfortunately weren't able to get the expert into the

18   FDC yesterday due to just their scheduling restrictions.

19      And so we're not asking the Court to release

20   Mr. Thomas with no conditions or minimal conditions or

21   even somewhat onerous conditions.  We're recommending,

22   essentially, all of the conditions that this court puts

23   in place.  For the location monitoring component, I have

24   recommended curfew rather than home detention just to

25   facilitate his ability to pick up additional hours or

1     additional shifts at work without needing the 48 hours

2     for pre-clearance.  But if the Court were to put him on

3     home detention, he is prepared to abide by whatever

4     restrictions the Court puts in place.

5        I also note that Mr. Thomas is not someone who is only

6     beginning to talk about services now.  We did provide to

7     Pretrial Services a confirmation email we received from

8     StopWA, which is a known provider of treatment related

9     to domestic violence and anger management.  He was

10    referred there through King County -- or through

11    Department of Corrections.  And they confirmed to us

12    that he did go and complete his evaluation on October

13    11th.  Although they haven't placed him in a group yet,

14    it was his understanding that if he had been out of

15    custody, he would have been able to attend a class on

16    the 29th of this month, and plans to re-engage with

17    that.

18       I'd also note that he, through essentially a community

19    resource -- it's a gentlemen who does violence reduction

20    work and had worked with Mr. Thomas's brother, helped

21    Mr. Thomas when he got out connect with -- he couldn't

22    remember the name so we couldn't get verification, but

23    what he remembers is it being essentially a dad's

24    program that he went to prior to engaging in STOP that

25    helped him learn about parenting, that helped him learn

1    about co-parenting, and that it was sort of, as he was

2    doing that and through that, that he and his son's

3    mother came up with the informal parenting plan that

4    they have.  Informal just in the sense that it's not

5    through a family court, but it is a set plan that they

6    follow.

7        Mr. Thomas is very dedicated to spending time with his

8    young son, sees him every week.  I know that his

9    employer has been great and really thoughtful about

10   trying to ensure that his schedule works in such a way

11   that he can have contact with his son.  And that, I

12   acknowledge, is not treatment that was mandated by DOC.

13   It's something that he sought out because he wants to be

14   there and he wants to be a dad and he wants his son to

15   grow up with him.

16       And with respect to the allegations of his last

17   conviction, that is not his child, his son's mother.

18   So the case with the no contact order is not with his

19   child's mother, with whom he currently has this

20   parenting plan.

21       The other thing that I would like to note, and I

22   will -- I will keep my remarks relatively brief because

23   I hope the Court does not need to rely on it in any

24   event.  But there is in the Pretrial Services report at

25   page 2 -- there are some, I would say, very generalized,

1     very nonspecific allegations that a Department of

2     Corrections officer made, apparently based upon prior

3     records, against Mr. Thomas's grandmother.

4      I can tell the Court that it was -- one, we object to

5     that being considered by this court. It's not something

6     that we agree happened, and I don't believe that

7     Specialist Conaty's allegations have even enough

8     specificity to be of any use to the Court. Here's no

9     indication of date or name or any of the types of

10     details that the Court looks to in order to be able to

11     sort of determine whether or not something occurred.

12      His grandmother, I think, was very hurt to hear that

13     there were allegations of that nature being made against

14     her. Absolutely denied that that took place. I can

15     tell the Court that she has been incredibly reliable and

16     speaking with myself and with Ms. Stewart. She and I

17     have, prior to today, I know she and Ms. Stewart have

18     spoken numerous times prior to today. And, again, she

19     is here in court in support of Mr. Thomas.

20      With respect to the drug and alcohol use, Mr. Thomas

21     did what we ask people to do, which is to be candid with

22     Pretrial Services. He indicates that he can stop

23     drinking alcohol and smoking marijuana. And I think

24     that the -- and we know that he would test positive for

25     marijuana initially, but that Pretrial Services would

1    look for the levels to come down.  My memory of the

2    interview is that he described the bottle being

3    something shared between him and his then-girlfriend.

4    Either way, we recognize that it's a concerning amount

5    of alcohol for someone to be drinking in an evening.

6        I will note, as it relates to the Government's

7    concerns about whether that would prevent him from

8    following through with any requirements the Court

9    would give him, that he has been making it to work and

10   he has been an exceptional employee and he has been

11   following through, and he did get the STOP assessment.

12   Perhaps some of that is owing to a 24- to 25-year-old

13   metabolism, but I think that what the Court sees is

14   someone who even sort of with that level of use was

15   maintaining a rigorous schedule at work, is committed

16   to desisting use, knows that using would land him

17   back in front of this court and likely in custody,

18   and has already completed a substance use disorder

19   evaluation.

20       The other thing that I would note is that if the Court

21   did not believe that releasing Mr. Thomas to live with

22   his grandmother is appropriate or the Court wanted more

23   information at this time, his mother did indicate to us

24   that she -- that he is welcome to live with her.

25       As the Court knows -- and I think, again, in a

1    testament to really how responsible Mr. Thomas is trying

2    to be in this portion of his life -- he is paying $500 a

3    month toward her rent, even though he rarely stays

4    there, understanding that she sort of needs a

5    supplemental income to maintain the home.  I did provide

6    her address and telephone number and full name to

7    Pretrial Services before the hearing.  And she, again,

8    has confirmed to Ms. Stewart that Mr. Thomas is welcome

9    to stay with her.  She is employed working at Napa, and

10   so that is an alternative address if the Court were to

11   want that.

12      The other point that I have for the Court is with

13   respect to the referral to either the YMCA Alive and

14   Free program or to Community Passageways, I initially

15   looked to Alive and Free because Community Passageway's

16   wait times are often fairly long because of how much

17   success they have in working with young people.  And so

18   that is part of why we were looking to Alive and Free

19   and we're hoping to just kind of have them work with us

20   on Mr. Thomas being three months older-ish than their

21   cut-off.

22      Ms. Stewart did speak with a representative from

23   Community Passageways today, and it turns out -- I don't

24   know if they just have more capacity now, but their

25   turnaround times are about a week and a half to two

1   weeks.  So our plan is to complete referrals to both to

2   get him sort of through and into whichever program is

3   able to start working with him soonest.  It's something

4   that he very much wants to do.

5     As I noted to the Court, his brother did work with a

6   similar type of program.  And so Mr. Thomas is someone

7   who is familiar with the kind of community-based

8   mentorship model, that is familiar with the model that

9   really looks to provide young people with support in the

10  community, with mentorships, to help people make more

11  pro-social friendships, to find friendships with people

12  who are trying to do great things in their lives in a

13  way that Mr. Thomas is.

14    And so on the whole, Your Honor, we think that all of

15  those conditions do reasonably assure both the safety of

16  the community and Mr. Thomas's return to court.  I am

17  certain that in speaking with him that if the Court had

18  any other conditions it wanted to impose, such as

19  Soberlink or something like that, that he would readily

20  agree to any conditions the Court has.

21    He recognizes that he has not been out of custody

22  terribly long at this point, but he is very genuinely in

23  a different place.

24    I also think that it bears note that the Government's

25  reference has been that he possessed firearms on two

 1     occasions.  And I think particularly with respect to the

 2     September 8th incident, I think it is -- I think that it

 3     has to be noted that if the Government would be

 4     proceeding to trial, we'd get there on a theory of

 5     constructive possession.  I also think that they have

 6     potential search issues with the September 8th incident.

 7     It's not -- I think that the officer calling something

 8     an "inventory search" doesn't make it an inventory

 9     search.  We obviously don't have discovery at this

10     point, but I think that Mr. Thomas has additional

11     incentive to return to court and to see his rights

12     vindicated in this case.

13        So on the whole, Your Honor, we do believe that

14     release is appropriate in this case with all of the

15     conditions that we have recommended.

16         Again, I am certain that if the Court wanted to

17     impose any additional conditions, that Mr. Thomas

18     would not have any objection to them.  And I would also

19     suggest that this might be a case where it would be

20     appropriate, if Your Honor is inclined to release him,

21     that we could set a status hearing out perhaps two weeks

22     since that's what we expect to be the timeline for at

23     least kind of the next steps of the intake into either

24     Alive and Free or Community Passageways.

25        THE COURT:  All right.  Thank you so much.

1   MS. PAI-THOMPSON:  Thank you.

2   THE COURT:  And does the Pretrial Office have anything

3  to add based upon what you've heard from either side?

4   MS. O'DONNELL:  Yes, Your Honor.  Just one point of

5  clarification in my own report, I meant to update it --

6  but as your Honor knows, this afternoon got a little bit

7  busy -- I mentioned he was under their jurisdiction

8  since October of 2021.  That was when he entered prison

9  on the King County Superior Court case.  So he has been

10  in the community since February of 2022, so less than a

11  year.

12   And then regarding some of the risk areas that defense

13  counsel mentioned and were listed in my report as

14  identified risk factors, a lot of those, yes, we could

15  address with conditions.  However, our greatest concern

16  is the fact that there were conditions in place that he

17  did not abide by while under community supervision,

18  which then would lead us to believe that there are no

19  conditions that would be available.

20   THE COURT:  All right.

21   Ms. Pai-Thompson?

22   MS. PAI-THOMPSON:  Yes, just briefly.  If the Court is

23  willing to hear from his manager --

24   THE COURT:  Sure.

25   MS. PAI-THOMPSON:  -- I had hoped to bring him up to

```
1        the podium.  And then may I grab some tissue?

2         THE COURT:  Sure.

3         MS. PAI-THOMPSON:  May I approach?  Thank you.

4         MR. LARSON:  Thank you.

5         THE COURT:  So good afternoon.  Why don't you just

6        stand right there by the microphone so we have you, and

7        just tell us your name and what you want me to know.

8         MR. LARSON:  My name is Ronald Larson.  I'm the store

9        manager at Normandy Park.  I've been there for several

10       months now.  I've been with T-Mobile for several years.

11       I've actually known the person that referred Gigi to

12       me -- that's his nickname, Thomas.  (Inaudible) things,

13       I haven't had a ton of time to work with him.  I know

14       that he's had some situations that he's been working

15       with the courts, and we've been going through and trying

16       to work with him.

17         One of the things I can say is that in the amount of

18       time I've had with him, he has been super reliable, very

19       friendly, very "get the job."  One of the things I can

20       say is, is that one of the things that I personally look

21       for is somebody that's nervous for wanting a position

22       when they're looking for a job.  Even with the prep, I

23       think that he was nervous and wanted to call and wanted

24       to have a good interview because the first interview

25       went with -- went through with me, and the second one
```

1        was with the district manager.

2          We were aware of the situations in the past and,

3        ultimately, we wanted to be able to work with him and

4        see how he did.  What I can say is, is as of right now,

5        he's been nothing but an exemplary employee, and I can't

6        speak to anything on his past.  All I can speak is to

7        what I see him in every day.  And what I can say is that

8        he is a part of the team.  He comes in, he's friendly,

9        he works with the customers, hasn't had any kind of

10       problems with anybody in any way, shape or form.

11         So one thing, I guess that's what I want to say the

12       most, is that as far as what I can personally see, is

13       that he has been nothing but excited and interested in

14       moving forward, despite whatever he has in this past

15       that hopefully will be resolved at some point.

16         THE COURT:  Mr. Larson, thank you so much.

17         MR. LARSON:  Mm-hmm.

18         THE COURT:  All right.

19         So, Mr. Thomas, I want to thank your grandma for

20       coming and Mr. Larson for coming and your whole defense

21       team that did a terrific job, but I'm sorry.  I'm not

22       going to release you.  And, you know, one of the things

23       that I really have to struggle with is you've had a lot

24       of challenges in the past, a lot of court contact.

25         I think the Government is right, and I guess the

1      Pretrial Officer's view about, I think the biggest

2      hurdle is you're actually on supervision already and

3      you are now facing and will face charges here in this

4      court.  At least from the Government's point of view,

5      this is not a one-time thing.  They view you as sort of

6      a person who has repeatedly possessed firearms on

7      supervision.

8        Who's going to win the case?  I don't know.  I don't

9      know anything about the suppression requests or anything

10     like that, the strength of the facts, but that'll play

11     itself out.  But in the meantime, I will issue a

12     detention order and you will be held pending the outcome

13     of the case.

14       All right, Mr. Wynne.  Anything further from the

15     United States?

16       MR. WYNNE:  Nothing, Your Honor.  Thank you.

17       THE COURT:  And, Ms. Pai-Thompson?

18       MS. PAI-THOMPSON:  Your Honor, I do -- which I

19     mentioned briefly, which is that we would plan to still

20     complete a referral to Alive and Free and to Community

21     Passageways.  And if he is accepted there, my hope would

22     be that the Court would entertain a motion to reopen and

23     to hear from one of their representatives.

24       THE COURT:  You're always invited to file motions on

25     anything new you find.

1          All right.  All right.  Thank you, everyone.  We will

2       recess this case and call our next case.

3                      (Conclusion of hearing)

4

5

6    /s/ Marjorie Jackson, CET

7    AAERT Certified Electronic Transcriber

8    Reed Jackson Watkins, LLC

9    Court Approved Transcription Company

10   800 5th Avenue, Suite 101-183

11   Seattle, Washington 98101

12   206.624.3005

13

14

15

16

17

18

19

20

21

22

23

24

25